UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH BULLOCK,<br><br>        Petitioner,<br><br>    -against-<br><br>MONICA RECKENWALD, et al.,<br><br>        Respondents. | 15cv5255 (LTS) (DF)<br><br>**REPORT AND<br>RECOMMENDATION** |

**TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:**

*Pro se* petitioner Joseph Bullock ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241, following prison disciplinary proceedings that resulted in his loss of 41 days of "good-time credit."  Petitioner is currently incarcerated at the Federal Correctional Institution in Otisville, New York ("FCI Otisville"), where he is serving a sentence of 20 years, resulting from his plea of guilty to Conspiracy to Possess with Intent to Distribute Heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

In his petition for a writ of habeas corpus (Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241, dated June 28, 2015 ("Pet." or "Petition") (Dkt. 2)), Petitioner alleges that his Constitutional rights to due process, equal protection, and access to the courts were violated in connection with his prison disciplinary proceedings.  Specifically, Petitioner alleges that his due-process rights were violated because certain documents related to his disciplinary proceedings were delivered to him in an untimely manner, purportedly in violation of Federal Bureau of Prisons ("BOP") regulations.  (*Id.* at 12-21, 28-29.)  Petitioner further contends that his equal-protection rights were violated because, unlike the manner in which his disciplinary proceedings were conducted, the disciplinary proceedings of two allegedly similarly situated inmates were dismissed, purportedly due to the untimely delivery of documents.  (*Id.* at 22-24.)

Finally, Petitioner alleges that his First Amendment right to access to the courts was violated because the electronic law library at FCI Otisville was non-operational for the three weeks leading up to one of his disciplinary hearings.  (*Id.* at 24-28.)  As a remedy for these alleged violations, Petitioner requests that 41 days of forfeited good-time credit be returned, and that his disciplinary record be expunged of both the report underlying his disciplinary proceedings and the sanctions arising from those proceedings.  (*Id.* at 29.)

Separately, Petitioner moves for the imposition of judicial sanctions against respondent Juan Baltazar ("Baltazar" or "Respondent"),[1] pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent powers (Petitioner's Motion for Sanctions, dated Jan. 5, 2016 ("Pet. Sanctions Mot.") (Dkt. 34)), on the ground that Respondent fabricated evidence in opposing the Petition.  In particular, as a sanction for this alleged fraud on the Court, Petitioner seeks a default judgment on his Petition in his favor.  Given that the relief requested in Petitioner's sanctions motion would be claim-dispositive if granted, this Report and Recommendation will address Petitioner's sanctions motion, as well as the merits of his underlying Petition.

---

[1] Although Petitioner names as respondents both the former warden of FCI Otisville, Monica Reckenwald ("Reckenwald"), and current warden, Baltazar, only Baltazar is a proper respondent at this time.  (*See* Letter to the Court from Assistant United States Attorney Brandon H. Cowart, dated Feb. 18, 2016 (Dkt. 38) ("Resp. Sanctions Opp."), at 1 n.1 (representing that Reckenwald is longer the warden at FCI Otisville, and that Baltazar has succeeded her); *see also Adikov v. Mechkowski*, No. 16cv3797 (JPO), 2016 WL 3926469, at *1 (S.D.N.Y. July 18, 2016) (noting that the proper respondent in a habeas petition challenging present confinement is "the warden of the detention facility with physical custody of the petitioner . . . with the ability to produce the petitioner pursuant to a writ of habeas corpus" (internal quotation marks and citations omitted)).  If, however, the Court were to adopt the within recommendation that the Petition be dismissed and sanctions denied (*see* Discussion *infra*), there would be no practical need to amend the caption of this action to drop an improperly named party.

For the reasons set forth below, I recommend that the Petition be dismissed in its entirety and that Petitioner's sanctions motion be denied.

## BACKGROUND

**A.   Factual Background**

**1.   Petitioner's Conviction and Sentence**

Petitioner was convicted in the United States District Court for the Eastern District of Virginia after pleading guilty to conspiring to distribute one kilogram of heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1).  (Pet., at 4.)[2]  On February 29, 2000, Petitioner was sentenced to 240 months of imprisonment and a five-year term of supervision.  (*See id.*; Declaration of Stephanie Scannell-Vessella, dated Nov. 20, 2015 ("11/20/15 Scannell-Vessella Decl.") (Dkt. 24), Ex. A (Dkt. 24-1).)[3]  If Petitioner were to serve his full term (without any credit reductions), then he would be scheduled for release on August 9, 2019.  (11/20/15 Scannell-Vessella Decl. ¶ 4.)  If all of his earned and projected good-conduct time is allowed – not

---

[2] *See also United States v. Bullock*, 21 F. App'x 109, 110 (4th Cir. 2001).

[3] Scannell-Vessella is a BOP staff attorney, who submitted a declaration in support of Respondent's opposition to the Petition.  (11/20/15 Scannell-Vessella Decl. ¶ 1.)  Respondent's opposition, filed on November 27, 2015, was accompanied by three other declarations, as well, including declarations from FCI Otisville Correctional Counselor, Anthony Gurrera; BOP Regional Discipline Hearing Administrator, Curtis L. Hise; and FCI Otisville Education Department Supervisor, Alicia Whinnery.  (*See* Respondent's Memorandum of Law and Return in Opposition to the Petition for a Writ of Habeas Corpus, dated Nov. 27, 2015 ("Resp. Habeas Opp.") (Dkt. 23), at 2 n.1; Declaration of Anthony Gurrera, dated Nov. 19, 2015 ("Gurrera Decl.") (Dkt. 25); Declaration of Curtis L. Hise ("Hise"), dated Nov. 18, 2015 ("Hise Decl.") (Dkt. 26); Declaration of Alicia Whinnery, dated Nov. 20, 2015 ("Whinnery Decl.") (Dkt. 27).)

including the 41 days of good-conduct time at issue in this litigation – then his release date will be July 6, 2017.  (*Id.*; *see also id.*, Ex. A.)

### 2.     **Petitioner's Alleged Misconduct While Incarcerated**

On January 31, 2015, Petitioner was placed on "dry-cell status" after FCI Otisville staff observed him exchange a "suspicious kiss" with a social visitor.  (*Id.*, Ex. B.)  According to the United States Department of Justice, Bureau of Prisons Program Statement ("BOP Program Statement"), an inmate is placed in a so-called "dry cell" (*i.e.*, a cell without plumbing), if prison staff reasonably believes that he or she has ingested contraband.  *See* BOP Program Statement 5521.06 (July 6, 2015), at 5-6.  After being placed on dry-cell status, the inmate is observed until he or she has "voided the contraband or until sufficient time has elapsed to preclude the possibility that the inmate is concealing contraband."  28 C.F.R. § 552.12.

On February 1, 2015 at approximately 10:15 a.m., while on dry-cell status, Petitioner allegedly voided from his bowels a balloon containing 10 orange strips.  (Pet., at 7; 11/20/15 Scannell-Vessella Decl., Ex. B.)  At approximately 12:25 p.m. the same day, Petitioner allegedly voided from his bowels another balloon, also containing 10 orange strips.  (Pet., at 7; 11/20/15 Scannell-Vessella Decl., Ex. B.)  According to Respondent, prison staff tested some of these strips and determined that they contained Buprenorphine, also known as Suboxone.  (Pet., at 7-8; 11/20/15 Scannell-Vessella Decl., Ex. B-F (investigator memorandum, photographs, and chain of custody logs).)  Buprenorphine is a Schedule III controlled substance.  *See* 21 C.F.R. § 1308.13(e).[4]

---

[4] *See also* U.S. Food and Drug Administration, Medication Guide, Suboxone, *available at* www.fda.gov/downloads/Drugs/.../UCM225677.pdf (last visited Aug. 8, 2016) ("Suboxone is a prescription medicine used to treat adults who are addicted to (dependent on) opioid drugs (either prescription or illegal) as part of a complete treatment program that also includes counseling and behavioral therapy.  Suboxone is a controlled substance (CIII) because it contains

### 3.   Petitioner's Incident Report and Administrative Detention

On the morning of February 2, 2015, prison staff prepared an incident report, alleging that Petitioner had violated BOP Code 113, which governs "[p]ossession of narcotics not prescribed to the individual."  (Pet., Ex. B (BOP Incident Report # 2678348, dated Feb. 2, 2015 ("Incident Report")) §§ 9-10, 13.)  BOP regulations categorize such a violation as a "Greatest Severity Level Prohibited Act."  *See* 28 C.F.R. § 541.3, Table 1.  According to the Incident Report, prison staff "became aware of the incident" on February 1, 2015 at 12:25 p.m.  (Incident Report § 11.)  Based on "[s]upporting memos, photographs, [and] chain of custody [logs]," the Incident Report concluded that the charges against Petitioner were "warranted" and that there was "sufficient evidence" of Petitioner's misconduct "to move forward with the disciplinary process."  (11/20/15 Scannell-Vessella Decl., Ex. G[5] §§ 25-26.)

Respondent maintains that, on the morning of February 2, 2015, the BOP referred Petitioner's alleged misconduct to the Federal Bureau of Investigation ("FBI") for possible criminal prosecution.  (11/20/15 Scannell-Vessella Decl. ¶ 11 & Ex. H, at 1; *see also* Supplemental Declaration of Stephanie Scannell-Vessella, dated Feb. 18, 2016 ("2/18/16 Scannell-Vessella Decl.") (Dkt. 39), Ex. 1 (Dkt. 39-1)).  According to Petitioner, he was not

---

buprenorphine, which can be a target for people who abuse prescription medicines or street drugs.").

[5] Exhibit G to the 11/20/15 Scannell-Vessella Declaration is Respondent's copy of the Incident Report.  This copy contains two pages, unlike Petitioner's copy, which only contains one page.  (*Compare id*. *with* Pet., Ex. B.)  According to Petitioner, Respondent's copy contains an "amendment" to section 27 of the report (*see* Petitioner's Memorandum of Law and Reply to Respondent's Return in Opposition to this Petitioner's Petition for a Writ of Habeas Corpus, dated Dec. 17, 2015 ("Pet. Habeas Reply") (Dkt. 32), at 4-5), and this Court will therefore refer to Exhibit G as an "Amended Incident Report."  Besides the one amendment referenced by Petitioner, however, he makes no allegation that Respondent's copy differs from his own.  (*See id*.)  It is unclear why Petitioner did not submit the original (un-amended) second page of the Incident Report with his filings.

made aware of this referral until the present litigation (Declaration of Joseph Bullock, dated

Jan. 5, 2016 ("1/5/16 Bullock Decl.") (Dkt. 35) ¶ 4), and he now challenges Respondent's

assertion that the referral was actually made (*see* Addendum, dated Dec. 30, 2015 ("Pet. Reply

Addendum") (Dkt. 33), at 2-3; *see also* Pet. Sanctions Mot. ¶¶ 6-7; Memorandum of Law in

Support of Petitioner's Motion for Sanctions, dated Jan. 5, 2016 ("Pet. Sanctions Mem.")

(Dkt. 36), at 2-3).  In any event, midday on February 2, 2015, Petitioner was placed in

administrative detention in the FCI Otisville Special Housing Unit (the "SHU").  (Pet., at 24-25;

Whinnery Decl. ¶ 3.)  Petitioner's Administrative Detention Order noted that Petitioner would be

held "[p]ending a hearing for a violation of Bureau regulations."  (Pet., Ex. A.)  A potential

alternative reason for detention – detention "[p]ending investigation . . . for a criminal act" – was

not checked on the Order.  (*Id.*)

The Incident Report states that it was delivered to Petitioner at 7:30 p.m. on February 2,

2015, by Lieutenant S. Kostecki ("Lt. Kostecki").  (Incident Report §§ 15-16; *see also* Pet., at 8.)

At the time of delivery, Lt. Kostecki reportedly advised Petitioner of his right to remain silent,

and Petitioner reportedly responded that he was pleading "no contest" to the charges in the

Incident Report.  (Amended Incident Report §§ 23-24.)  Given the nature of the charges in the

Incident Report, the matter was referred from the Unit Discipline Committee ("UDC") to the

Disciplinary Hearing Officer ("DHO") at FCI Otisville for further disposition.  (*See* Incident

Report § 18.)

According to Respondent, on February 4, 2015, the FBI declined to recommend

Petitioner's alleged misconduct for criminal prosecution.  (*See* Resp. Habeas Opp., at 3; 11/20/15

Scannell-Vessella Decl., Ex. H, at 2.)

### 4.    Events Leading Up to Petitioner's DHO Hearing

#### a.    Notice of Hearing and Rights

On February 5, 2015, Petitioner was provided notice of his hearing before the DHO regarding the charges raised in the Incident Report.  (Pet., at 8; 11/20/15 Scannell-Vessella Decl., Ex. I.)  Petitioner's DHO hearing was scheduled for February 23, 2015.  (Pet., at 54-57 (BOP Discipline Hearing Officer Report re: Incident Report # 2678348, signed Mar. 6, 2015 ("DHO Report")), § III(B).)

Also on February 5, 2015, Petitioner was provided (and acknowledged receipt of) a written statement advising him of his rights in connection with the DHO hearing.  (11/20/15 Scannell-Vessella Decl., Ex. J; *see also* Pet., at 8.)  These rights were described as follows:

1.    The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the Discipline Hearing Officer;

2.    The right to have a full-time member of the staff who is reasonably available to represent you before the Discipline Hearing Officer;

3.    The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf, provided institutional safety would not be jeopardized;

4.    The right to present a statement or to remain silent. . . . ;

5.    The right to be present throughout the discipline hearing except during a period of deliberation or when institutional safety would be jeopardized. . . . ;

6.    The right to be advised of the DHO's decision, the facts supporting that decision, except where institutional safety would be jeopardized, and the DHO's disposition in writing; and,

7.    The right to appeal the decision of the DHO . . . .

(11/20/15 Scannell-Vessella Decl., Ex. J.)  According to a document submitted by Respondent, Petitioner waived his right to a staff representative and his right to call witnesses at the hearing. (*Id.*, Ex. I.)

Petitioner maintains that, later on February 5, 2015, a BOP "unit counselor" named Mr. Gushue asked him how he pleaded to the Incident Report ahead of the hearing, to which Petitioner claims he responded, "nolo contendere."  (*See* Pet. Reply Addendum, at 1.)

### b.   Petitioner's Alleged Denial of Access to Legal Materials

According to Petitioner, from February 4, 2015 to February 26, 2015, which included the entire time that he was supposed to be preparing for his DHO hearing, the electronic law library in the SHU, where he was being held, was non-operational due to a broken electrical outlet. (Pet., at 24-25.)  The Supervisor of the Education Department at FCI Otisville confirmed through a Declaration filed in this matter that the electronic law library to which the Petitioner refers was the only means through which inmates held in the SHU could access legal materials during this time frame.  (*See* Whinnery Decl. ¶ 4.)  Petitioner asserts that he informed "SHU Lieutenant Dill" ("Dill") of the broken electrical outlet and "complained repeatedly" to him about getting it repaired.  (Pet., at 25.)  Dill allegedly told Petitioner that he was "working on it."  (*Id.*) Petitioner further asserts that he asked Dill if he could repair the outlet himself because he was a "Certified Electrician."  (*Id.*)  According to Petitioner, Dill declined.  (*Id.*)  Petitioner also maintains that he informed the Associate Warden, Mr. Merlak ("Merlak"), of the broken electrical outlet, and that Merlak told him that he "would look into it."  (*Id.*)  Two weeks after Petitioner alleges that the electronic law library became non-operational, an engineer from the prison's facility department reportedly took photographs of the broken electrical outlet.  (*Id.*)

Petitioner maintains, however, the outlet was not repaired for another week, and that he did not have access to the electronic law library until February 26, 2015.  (*Id.*)

### 5.  **Petitioner's DHO Hearings**

Petitioner's first DHO hearing was held on February 23, 2015.  (*See* Affidavit in Support of Brief of Joseph Bullock, dated Nov. 13, 2015 ("11/13/15 Bullock Aff.") (Dkt. 20) ¶ 9.)  He brought with him to the hearing a three-page written statement regarding the Incident Report. (*Id.* ¶¶ 10-12; *see also* Pet., Ex. C.)  In his written statement, Petitioner claimed that his Fifth Amendment due-process rights were violated because the Incident Report was delivered to him over seven hours later than the BOP's rules purportedly allowed.  (Pet., Ex. C, at 1.)  He also claimed that a late delivery of the report was only permissible under the BOP's rules if "good cause" for the delay was "documented in the discipline record."  (*Id.* at 2.)  According to Petitioner's written statement, there was no such documentation in his disciplinary record.  (*Id.*) Petitioner further claimed through his written statement that he was "Not Guilty" of the charges in the Incident Report, and asked that the DHO "dismiss" the Incident Report.  (*Id.* at 1, 3.)

The February 23, 2015 hearing was held before DHO J. M. Banks ("DHO Banks"). (DHO Report § IX.)  At the hearing, Petitioner states that he asked DHO Banks whether DHO Banks saw any documentation in Petitioner's disciplinary record showing "good cause for the delay" in the delivery of his Incident Report.  (Pet., at 8-9.)  According to Petitioner, DHO Banks "then looked through the record and stated [that] 'he d[id] not have documentation in the record showing good cause for the delay.'"  (*Id.* at 9.)  DHO Banks then purportedly stated that he was "going to the Lieutenant's Office to see if they ha[d] good cause for the delay," and, "if Lt. [Kostecki] [did] not have good cause for the delay, he would dismiss the Incident Report." (*Id.*)  The hearing was then adjourned.  (*Id.*; *see also* DHO Report § III(B).)

After the hearing, DHO Banks reportedly asked Lt. Kostecki why his delivery of the Incident Report was delayed.  (DHO Report § III(B).)  According to the DHO Banks' report, "[t]he delay was documented and the reasoning was the lieutenant mistakenly counted the 'ordinary 24 hour time' from section 13 [of the Incident Report] and not section 11."  (*Id.*)  Section 13 of the Incident Report documents the time that the Incident Report was prepared, whereas section 11 documents the time at which prison staff became aware of the underlying incident.  (*See* Incident Report §§ 11, 13.)  Respondent's submissions suggest that Lt. Kostecki amended section 27 of the Incident Report to reflect the reason for this delay.  (*See* Amended Incident Report § 27 ("Incident report was delivered late to i/m as the investigator [ ] judged the 24 hour delivery time on section 13 of the report not section 11."  [apparent signature of Lt. Kostecki]); *see also* n.5, *supra*.)  According to Petitioner, he was not given notice of this amendment or served with the Amended Incident Report until his second hearing before DHO Banks, held on February 27, 2015.  (*See* Pet. Habeas Reply, at 5; *see also* DHO Report § III(B).)

At the February 27, 2015 hearing, DHO Banks reportedly asked Petitioner how the seven-hour delay in receiving the Incident Report had "hampered, hindered or prevented him from preparing a defense for this DHO hearing."  (DHO Report § III(B).)  Petitioner allegedly responded that the delay "violated his Due Process."  (*Id.*)  According to the DHO Report, DHO Banks then concluded that the delay did not "hamper, hinder or prevent [Petitioner] from preparing [for the hearing,] as evidenced by [Petitioner] having a written statement prepared." (*Id.*)

### 6.    **The DHO Report**

DHO Banks apparently rendered his decision on the matter on March 6, 2015, finding that Petitioner had possessed narcotics in violation of BOP Code 113, as alleged in the Incident

Report.  (*See* DHO Report §§ V, IX.)  On April 2, 2015, Petitioner was provided with a written

explanation for DHO Banks' decision, in the form of the DHO Report.  (Pet., at 9; *see also*

DHO Report §§ III-VII.)  The DHO Report noted that Petitioner had admitted that the "incident

report [was] true."  (DHO Report §§ III(A), III(B), V.)  Petitioner, however, denies that he ever

admitted to the allegations in the Incident Report, stating instead that he believes that

DHO Banks misunderstood his statements at the hearings.  (Pet., at 9-10.)  According to

Petitioner, he only "agreed with the facts such as:  when staff became aware of the incident and

when the Incident Report was delivered" – not with the allegation that that he possessed

narcotics within FCI Otisville.  (*Id.*)

      In concluding that Petitioner did, indeed, possess narcotics within FCI Otisville, however,

the DHO Report stated that DHO Banks had considered other evidence in addition to Petitioner's

purported admission, including "the [I]ncident [R]eport [and] supporting documentation."

(DHO Report § V.)  The "supporting documentation" appears to refer to the "Documentary

Evidence" listed in section III(D) of the DHO Report, which included a memorandum dated

February 1, 2015, submitted by the investigator who tested the strips that Petitioner had allegedly

voided while on dry-cell status, and "photographs of [the] substance," which appear to refer to

photographs of the contraband that Petitioner had allegedly voided.  (*Id.* §§ III(D), V.)

      In addition to finding that Petitioner had committed the acts alleged in the Incident

Report, DHO Banks imposed several sanctions on Petitioner, including the disallowance of 13

days of good-conduct time; the forfeiture of 28 days of non-vested good-conduct time; 30 days

of disciplinary segregation to be suspended pending 180 days of clear conduct; 18 months of

commissary restrictions; 18 months of visitation restrictions; and 18 months of immediate

family-only visits to begin when his other visitation restrictions ended.  (*Id.* § VI.)  The DHO

Report also provided the reasons that these sanctions were imposed:  to prevent Petitioner from committing the same or similar offense again, to punish Petitioner, and to deter Petitioner and others from similar behavior in the future.  (*Id.* § VII.)

### 7.      Petitioner's Administrative Appeals

As Respondent concedes, after Petitioner received the DHO Report, he timely exhausted all administrative remedies available to him by submitting appeals to the BOP Regional Director and the BOP Office of General Counsel.  (Resp. Habeas Opp., at 6-7; *see also* Pet., at 10-12.)  In those appeals, Petitioner raised the same claims as he now raises in his Petition before this Court. (*See* Resp. Habeas Opp., at 6-7; *see also* Pet., at 47-53 (documents related to Petitioner's administrative appeals).)  The BOP Regional Director denied Petitioner's appeal in a written decision, dated May 8, 2015.  (*See* Pet., at 50.)  The BOP Office of General Counsel never responded to Petitioner's appeal.  (Resp. Habeas Opp., at 7)  Pursuant to 28 C.F.R. § 542.18, and as conceded by Respondent, Petitioner was permitted to treat this lack of a response as a denial of his appeal.  (*See id.* (citing 28 C.F.R. § 542.18).)

### B.      Procedural History

Petitioner filed his habeas petition, pursuant to 28 U.S.C. § 2241, in this Court[6] on June 28, 2015,[7] together with a hand-written affidavit and documentary evidence.  (*See* Dkt. 2.)

---

[6] The Court has jurisdiction to decide this case, as Petitioner is currently incarcerated at FCI Otisville, which is located in this district.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement").

[7] Although the Court's docket reflects a filing date of July 6, 2015 for the Petition (Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on June 28, 2015, the date Petitioner signed it.  *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160,

On November 13, 2015, he filed another affidavit in support of his Petition.  (*See* 11/13/15 Bullock Aff. (Dkt. 20).)  On November 27, 2015, Respondent filed an opposition to the Petition, along with four declarations and documentary evidence.  (*See* Resp. Habeas Opp. (Dkt. 23); *see also supra*, at n.3 and exhibits attached thereto.)  On December 17, 2015, Petitioner filed a memorandum in reply (*see* Pet. Habeas Reply (Dkt. 32)), which he supplemented with an "Addendum" on December 30, 2015 (*see* Pet. Reply Addendum (Dkt. 33)).

Petitioner filed his sanctions motion on January 5, 2016.  (Pet. Sanctions Mot. (Dkt. 34).) He accompanied his sanctions motion with a supporting declaration, documentary evidence, and a memorandum of law.  (*See* Declaration of Joseph Bullock, dated Jan. 5, 2016 ("1/5/16 Bullock Decl.") and exhibits attached thereto (Dkt. 35); Pet. Sanctions Mem. (Dkt. 36).)  On January 27, 2015, Petitioner filed "additional authority" in support of his Petition, unrelated to his sanctions motion.  (*See* Petitioner's Additional Authority, dated Jan. 27, 2016 (Dkt. 37)).  On February 19, 2016 Respondent filed a letter in opposition to Petitioner's sanctions motion together with a declaration and other documentary evidence.  (*See* Resp. Sanctions Opp. (Dkt. 38); 2/18/16 Scannell-Vessella Decl. (Dkt. 39) and exhibits attached thereto (Dkt. 39-1).)  On February 25, 2016, Petitioner filed a letter in reply.  (*See* Letter to the Court from Joseph Bullock, dated Feb. 25, 2016 ("Pet. Sanctions Reply") (Dkt. 40).)

---

165 (S.D.N.Y. 2000).  For the same reason, the Court will deem each of Petitioner's other filings in this action to have been filed on the date that he signed them.

## DISCUSSION

I.  **PETITIONER'S *HABEAS* PETITION**

    A.  **Applicable Legal Standards**

        1.  **Availability of Habeas Corpus To
Challenge Loss of Good-Time Credit**

Under 28 U.S.C. § 2241, an inmate who "is in custody in violation of the Constitution or laws or treaties of the United States" may petition a court for a writ of *habeas corpus*.  28 U.S.C. § 2241(c)(3).  "A writ of *habeas corpus* under § 2241 is available to a federal prisoner who does not challenge the legality of his sentence, but challenges instead its execution subsequent to his conviction."  *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001).  A petition pursuant to 28 U.S.C. § 2241 is the proper vehicle through which a federal prisoner may seek to "expunge the [BOP's] disciplinary sanctions from his record, including the loss of good time credits."  *Id.* (citations omitted); *see also Houston v. Linaweaver*, No. 14cv2980 (PAE), 2014 WL 3610908, at *2 (S.D.N.Y. July 15, 2014).

A *pro se* habeas petition must be afforded a liberal construction.  *See Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) ("It is well settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest." (internal quotation marks and citation omitted)).

        2.  **Due Process**

Federal prisoners are "entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff*, 418 U.S. at 555-56).  Given that "[p]rison disciplinary proceedings are not part of a criminal prosecution," however, "the full panoply of rights due a[n] [inmate] in such proceedings does not apply."  *Wolff v. McDonnell*,

14

418 U.S. 539, 556 (1974).  In connection with such proceedings, due process only requires that inmates be afforded the protections outlined in *Wolff*, that is:  (1) "that the prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"; (2) "a hearing affording [the inmate] a reasonable opportunity to call witnesses and present documentary evidence"; (3) "a fair and impartial hearing officer"; and (4) "a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken."  *Sira*, 380 F.3d at 69-70 (citing *Wolff*, 418 U.S. at 563-67).  The written notice "should provide enough information such that it is possible for the inmate to prepare a defense to the charges against him."  *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 607-08 (S.D.N.Y. 2009).  Violations of *Wolff*'s requirements do not, however, warrant court intervention into prison disciplinary proceedings where those violations are harmless or non-prejudicial.  *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless . . . , surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation." (citations omitted)).[8]

As the Second Circuit has held, "in the context of [prison] disciplinary proceedings, 'the *only* process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff*.'"  *Rodriguez v. Lindsay*, 498 F. App'x 70, 71 (2d Cir. 2012) (quoting *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004) (emphasis in original)).  "[T]o the extent internal prison regulations grant protections beyond the constitutional minimum, noncompliance with those

---

[8] *See also Jones v. Cross*, 637 F.3d 841, 846-47 (7th Cir. 2011) (applying harmless error analysis in connection with *habeas* petitioner's allegation that he received an incident report late, purportedly in violation of BOP regulations).

regulations do not typically offend due process." *Agosto v. Hufford*, No. 13cv4082 (VEC) (SN), 2014 WL 2217908, at *3 (S.D.N.Y. May 8, 2014), *report and recommendation adopted*, 2014 WL 2217925 (S.D.N.Y. May 29, 2014) (citations omitted).[9]

Although some courts have suggested that non-compliance with BOP regulations could constitute a due-process violation, those courts have required that the inmate "demonstrate prejudice from the noncompliance." *Id.* at *4 (citations omitted); *see also Clark v. Dannheim*, 490 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citing *Powell*, 953 F.2d at 750) (additional citations omitted)); *Wallace v. Fed. Det. Ctr.*, 528 F. App'x 160, 162-63 (3d Cir. 2013) (holding that, even if an inmate received his incident report two months late, in violation of 28 C.F.R. § 541.5(a), he could not show that his rights to due process were violated, given that he received written notice of his charges a week prior to his hearing, in conformity with *Wolff*, and that he could not demonstrate that the delay prejudiced him).

---

[9] *See also Hughes v. Quintana*, No. LA CV 11-06389 (VBF), 2013 WL 5350668, at *3 (C.D. Cal. Sept. 23, 2013) ("'BOP regulations can provide more protection than the Constitution requires, but the regulations do not raise the standard of constitutional due process.'" (quoting *Delgadillo v. Outlaw*, No. 2:12cv174 (BD), 2013 WL 1246857, at *3 (E.D. Ark. Mar. 27, 2013)); *Rosa v. Grondolsky*, No. 13cv10496 (JGD), 2013 WL 3491077, at *7 (D. Mass. July 9, 2013) ("While the Supreme Court has held that procedural due process requires that an inmate be given at least 24 hours to prepare for his or her hearing on a disciplinary charge, *see Wolff*, 418 U.S. at 564, there is no constitutional requirement that a prisoner be given notice within 24 hours of the staff believing that a prisoner may be charged in the future with a disciplinary infraction.").

### 3.    Equal Protection

A federal prisoner's equal-protection claim is "construed under the equal protection guarantee of the Due Process Clause of the Fifth Amendment to the U.S. Constitution." *Martinez v. Huffard*, No. 13cv1854 (JPO) (SN), 2014 WL 8663307, at \*1 (S.D.N.Y. July 8, 2014), *report and recommendation adopted*, 2015 WL 182164 (S.D.N.Y. Apr. 21, 2015) (citing *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013)).  "The equal protection principles embodied in the Due Process Clause of the Fifth Amendment essentially direct 'that all persons similarly situated should be treated alike.'"  *Brandon v. Dist. of Columbia Bd. of Parole*, 823 F.2d 644, 650 (2d Cir. 1987) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).  Courts approach Fifth Amendment equal-protection claims "in the same fashion" as they do 14th Amendment equal-protection claims.  *United States v. Martinez*, 621 F.3d 101, 107 n.3 (2d Cir. 2010) (citation omitted).

As Petitioner has not alleged, even under a liberal construction of his Petition, that he belongs to any protected class,[10] this Court construes his equal-protection claim as having been brought under a "class of one" theory.  *See Anderson-El v. U.S. Parole Comm'n*, No. 05cv2697 (JSR), 2006 WL 2604723, at \*11 (S.D.N.Y. Sept. 11, 2006) (adopting report and recommendation (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)) (additional citations omitted)).  To sustain an equal-protection claim under a "class of one" theory, a petitioner "must establish intentionally different treatment from others similarly situated, with 'no rational basis for the difference in treatment.'"  *Bowens v. Fed. Bureau of Prisons*, No. 12cv5591 (PKC), 2013 WL 3038439, at \*8 (S.D.N.Y. June 18, 2013) (quoting

---

[10] *See generally Lee v. Governor of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class").

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (additional internal quotation marks and citations omitted)); *see also Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (noting that, in the prison setting, to prevail on an equal-protection claim, the inmate "must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.'" (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001) (alteration in original)). Moreover, "'class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Martinez*, 2014 WL 8663307, at *2 (quoting *Ruston v. Town Bd. of Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010)).

### 4. Access to the Courts

"[P]risoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *see also Hudson v. Palmer*, 468 U.S. 517, 522 (1984) (noting that this right is grounded in "the constitutional right to petition the Government for redress of their grievances" under the First Amendment of the U.S. Constitution). Making law library facilities available to prisoners is "'one constitutionally acceptable method to assure meaningful access to the courts.'" *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996) (quoting *Bounds*, 430 U.S. at 830). In order to establish a violation of this right, though, a prisoner must show, in his petition, that the respondent's conduct was "deliberate and malicious," and that the respondent's actions "resulted in actual injury." *See Crichlow v. Fischer*, No. 12cv7774 (NSR), 2015 WL 678725, at *7 (S.D.N.Y. Feb. 17, 2015) (internal quotation marks and citation omitted). To demonstrate an "actual injury," the prisoner must show that the respondent's conduct "frustrated [the prisoner's] efforts to pursue a nonfrivolous claim." *Id.* (internal quotation marks and citation omitted).

Moreover, a prisoner's constitutional right to court access does "not require him to receive access to legal material or legal assistance in order to prepare for his disciplinary hearing

18

and appeal." *Salvatierra v. Connolly*, No. 09cv3722 (SHS) (DF), 2010 WL 5480756, at *21

(S.D.N.Y. Sept. 1, 2010), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3,

2011).  Rather, a prisoner's right to court access "encompasses only that access needed to 'attack

[his or her] sentence[ ] . . . [or] challenge the conditions of [his or her] confinement.'"  *Id.*

(quoting *Lewis*, 518 U.S. at 354).  Indeed, "[t]he relevant precedent generally deals with access

to *courts*, not to prison administrative proceedings."  *Id.* (citing *Lewis*, 518 U.S. at 350-51

(emphasis in original)).  "Accordingly, it has been held that an alleged inability to present a

meaningful defense in a prison disciplinary hearing does not give rise to an access to courts

claim."  *Id.* (citing *Nicholas v. Remillard*, No. 92cv900, 1997 U.S. Dist. LEXIS 18113, at *14-16

(N.D.N.Y. Nov. 13, 1997)); *see also Young v. Tyron*, No. 12cv6251 (CJS), 2015 WL 309431,

at *13 (W.D.N.Y. Jan. 23, 2015), *report and recommendation adopted*, 2015 WL 554807

(W.D.N.Y. Feb. 11, 2015) ("[A]lthough an inmate has a constitutional right of access to the

courts . . . such rights are limited to 'defense against criminal charges, challenges to the inmate's

conviction through direct appeal, applications for habeas corpus relief, and civil rights claims.'"

(quoting *Schick v. Apker*, 2009 WL 2016933, at *8 (S.D.N.Y. Mar. 5, 2009), *report and

recommendation adopted in relevant part*, 2009 WL 2016926 (S.D.N.Y. July 10, 2009)).

**B.      The Petition Should Be Dismissed.**

As an initial matter, the Petition is timely.  "A petitioner may file an application for a writ

of habeas corpus pursuant to § 2241 at any time during his incarceration."  *Jobe v. Fed. Bureau

of Prisons*, No. 14cv701 (CM) (RLE), 2015 WL 4038490, at *2 (S.D.N.Y. June 5, 2015)

(adopting report and recommendation); *see also Anderson-El*, 2006 WL 2604723, at *3 ("There

is no limitations period applicable to § 2241").  Further, Petitioner's filings show, and

Respondent concedes, that Petitioner exhausted all administrative remedies available to him

19

before filing the Petition.  (Pet., at 10-12, 47-53; Resp. Habeas Opp., at 6-7; *see generally* 28 C.F.R. §§ 542.10-542.19.)  The Petition is therefore properly brought before the Court at this time.  *See Jobe*, 2015 WL 4038490 at *3 (citing *Carmona*, 243 F.3d at 634).  Nonetheless, the Petition should be dismissed, for lack of merit.

### 1.   <u>Petitioner's Due-Process Claims</u>

Petitioner contends that his due-process rights were violated in connection with his prison disciplinary proceedings in at least three ways:  (1) the Incident Report relating to his alleged misconduct was delivered to him seven hours after the time that BOP regulations purportedly required (*see* Pet., at 12-21); (2) he was not put on notice of Lt. Kostecki's explanation for the seven-hour delay until his second and final hearing before the DHO (*see* Pet. Habeas Reply, at 4-7); and (3) the DHO Report regarding the disposition of his disciplinary proceedings was delivered to him more than 15 work days after his hearing, purportedly in violation of BOP regulations (*see id.* at 28-29).  Petitioner also alleges that the DHO Report mistakenly assumed that he had admitted to the allegations in the Incident Report.  (*Id.* at 9-10.)  Although it is not clear whether Petitioner alleges that this mistaken assumption itself constitutes a due-process violation, this Court will liberally construe the Petition to include such a claim.

### a.   <u>Relevant BOP Regulatory Framework</u>

Federal prisoners are subject to the BOP's program for inmate discipline.  28 C.F.R. §§ 541.1, 541.2.  The disciplinary program begins once BOP staff "witness or reasonably believe" that an inmate has committed a "prohibited act."  28 C.F.R. § 541.5(a); *see also* 28 C.F.R. § 541.3 (listing prohibited acts by level of severity (*i.e.*, "Greatest," "High," "Moderate," and "Low") and available sanctions).  The initial step in the program involves a BOP staff member issuing an "incident report," describing the underlying incident and the

prohibited act or acts that the inmate is charged with committing.  28 C.F.R. § 541.5(a).

According to BOP regulations, an inmate "will ordinarily receive the incident report within 24

hours of staff becoming aware of [the inmate's] involvement in the incident."  *Id.*  The BOP's

Program Statement addresses the timing of the delivery of the incident report, as well, noting that

a BOP staff member is to

> provide[ ] a copy of the incident report to the inmate at the
> beginning of the investigation, unless there is good cause for later
> delivery, such as absence of the inmate from the institution or a
> medical condition that argues against delivery. . . . The reason for
> the delay must be documented in the discipline record.
>
> The incident report should be delivered to the inmate within 24
> hours of the time staff become aware of the inmate's alleged
> misconduct.  If an incident is referred for prosecution, the report is
> delivered by the end of the next business day after release for
> administrative processing.

BOP Program Statement 5270.09 (Aug. 1, 2011), at 18-19.

After the incident report is delivered, a BOP staff member is supposed to conduct an

investigation of the underlying incident.  28 C.F.R. § 541.5(b).  The investigation "may be

suspended," however, if the underlying incident "is being investigated for possible criminal

prosecution."  28 C.F.R. § 541.5(b)(2).

Once the investigation is complete, the UDC reviews the incident report.  28 C.F.R.

§ 541.7.  If, as here, the inmate is charged with committing a "Greatest or High severity

prohibited act," then the UDC refers the incident report to a DHO for further review.  28 C.F.R.

§ 541.7(a)(4).  The DHO, in turn, holds a hearing on the charges alleged in the incident report.

28 C.F.R. § 541.8.  BOP regulations provide that, after the hearing, the inmate is to "receive a

written copy of the DHO's decision."  28 C.F.R. § 541.8(h).  Although the BOP regulations do

not speak to when such a decision must be delivered to the inmate, the BOP Program Statement

provides that "[t]he DHO gives the inmate a written copy of the decisions and disposition, ordinarily within 15 work days of the decision."  BOP Program Statement 5270.09, at 34.

### b.   Petitioner's Alleged Due-Process Violations

As the Second Circuit has held, "the *only* process due an inmate" in prison disciplinary proceedings "'is that minimal process guaranteed by the constitution, as outlined in *Wolff*.'"  *Rodriguez*, 498 F. App'x at 71 (quoting *Shakur*, 391 F.3d at 119 (emphasis in original)).  Thus, regardless of whether Respondent violated BOP regulations or the BOP Program Statement, if Petitioner has failed to demonstrate any due-process violations under *Wolff*, his due-process claims must fail.

### i.   Petitioner Has Not Demonstrated a Due-Process Violation Under *Wolff*.

First, it is undisputed that Petitioner's first DHO hearing was held on February 23, 2015, and that Petitioner received notice of the charges against him in the form of his Incident Report 21 days earlier, on February 2, 2015.  The timing of this notice complies with *Wolff*, as all *Wolff* requires is that an inmate receive such notice 24 hours before his or her disciplinary hearing.  *See id.* ("*Wolff*'s relevant 24-hour notice period does not run from the perpetration of the alleged incident, but rather works backward from the beginning of the disciplinary hearing relating to that incident." (citing *Sira*, 380 F.3d at 70)).  In terms of the content of the Incident Report, Petitioner has not alleged that the Incident Report lacked sufficient information to allow him to prepare a defense to the charges against him.

Second, Petitioner has not alleged that he was denied an opportunity to call witnesses or present documentary evidence at the hearing, at least in terms of witnesses or evidence relating to the specific charges against him.  (*See also* 11/20/15 Scannell-Vessella Decl., Ex. I (document dated Feb. 5, 2015, apparently bearing Petitioner's signature and showing a check-mark

indicating that he did not wish to call any witnesses).)  Petitioner does maintain, though, that

Respondent's failure to provide him notice of Lt. Kostecki's explanation for delivering his

Incident Report 31 hours after the incident, instead of within 24 hours, deprived him of

information would have led him to request that Lt. Kostecki be called as a witness for

questioning.  (*See* Pet. Habeas Reply, at 4-7.)[11]  The only questions Petitioner asserts that he

would have asked Lt. Kostecki, however, relate to Lt. Kostecki's explanation for delivering his

Incident Report at the time that he delivered it.  (*See id.* at 7 ("Petitioner would suggest with

some notice he would have asked that [Lt. Kostecki] appear at the hearing and be asked (1) how

many incident reports has he served, and (2) how many times has he made the mistake with ¶ 11

and ¶ 13, as he claimed occurred in this matter?  What if he said 500 times and never made any

mistakes?").)  Petitioner has not asserted that he would have asked Lt. Kostecki any questions

regarding the underlying facts alleged in the Incident Repor (regarding Petitioner's alleged

ingestion of a controlled substance); nor has Petitioner asserted that Lt. Kostecki had any

personal knowledge relating to such facts.

     Regardless of whether Petitioner's allegations regarding the withholding of information

regarding Lt. Kostecki's actions would, if true, support a due-process violation under *Wolff*, the

violation, if any, is harmless.  As the Second Circuit has held, harmless violations of *Wolff*'s

requirements do not warrant judicial relief.  *See Powell*, 953 F.2d at 750.  Although Petitioner

has alleged that DHO Banks told him that, "if Lt. [Kostecki] [did] not have good cause for the

delay, he would dismiss the Incident Report" (Pet., at 9), the DHO Report itself does not contain

any indication that DHO Banks relied on Lt. Kostecki's explanation, or determined that

---

[11] Although this Court need not consider arguments raised for the first time in a reply brief, even in the *pro se* context, *see Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996), this Court has exercised its discretion to consider this argument.

Lt. Kostecki's explanation constituted "good cause," in adjudicating the matter (*see* DHO Report § III(B)).  Instead, the DHO Report suggests that DHO Banks conducted his own analysis regarding any prejudice that may have been caused by Lt. Kostecki's delayed delivery of the Incident Report, and concluded that the delay was harmless.  Indeed, the DHO Report provides,

> The DHO asked Bullock how this delay hampered, hindered or prevented him from preparing a defense for this DHO hearing.  He stated it violated his Due Process.  The DHO concluded it didn't hamper, hinder or prevent him from preparing as evidenced by him having a written statement prepared.

(*Id.*)  Accordingly, Petitioner has failed to demonstrate how being able to call Lt. Kostecki as a witness, so that he could challenge his credibility, would have made any difference in DHO Banks' adjudication of Petitioner's disciplinary proceedings.[12]

Third, Petitioner has not alleged that DHO Banks was not "a fair and impartial hearing officer."

Fourth, Petitioner does not deny that he received "a written statement of [DHO Banks'] disposition, including the evidence relied upon and the reasons for the disciplinary actions taken."  *See Sira*, 380 F.3d at 69-70 (citing *Wolff*, 418 U.S. at 563-67).  Petitioner does, however, allege a due-process violation emanating from the fact that the written statement, *i.e.*, the DHO Report, was delivered to him on April 2, 2015, despite the fact that the last hearing took place on February 27, 2015, and DHO Banks apparently rendered a decision on March 6, 2015.  (*See* Pet., at 28-29.)  Petitioner alleges that the delivery of the DHO Report was untimely under the BOP Program Statement, which provides that the report is "ordinarily" delivered "within 15

---

[12] Moreover, even if Petitioner had received notice of Lt. Kostecki's explanation and requested to call him as a witness, DHO Banks could have denied that request consistent with *Wolff*, as *Wolff* provides prison officials with the discretion to deny a request to call witnesses on such grounds as "irrelevance" or "lack of necessity."  *Wolff*, 418 U.S. at 565.

work days of the decision," BOP Program Statement 5270.09, at 34,[13] and that this delay caused

him prejudice because, according to Petitioner, "when this case is presented to the Second

Circuit Court of Appeals[,] his sentence would have expired."  (Pet., at 29.)

      *Wolff*, however, does not provide a particular time frame during which a document

comparable to a DHO Report must be delivered to an inmate.  *See Wolff*, 418 U.S. at 563-64.

Moreover, given that the only process due an inmate in prison disciplinary proceedings is the

process outlined in *Wolff*, *see Rodriguez*, 498 F. App'x at 71, a mere violation of the BOP

Program Statement, if not also a violation of *Wolff*, cannot amount to a due-process violation,

*see, e.g.*, *Reeb v. Thomas*, 636 F.3d 1224, 1227 (9th Cir. 2011) ("A habeas claim cannot be

sustained based solely upon the BOP's purported violation of its own program statement because

noncompliance with a BOP Program statement is not a violation of federal law.  Program

statements are 'internal agency guidelines [that] may be altered by the [BOP] at will' and that are

not 'subject to the rigors of the Administrative Procedure Act, including public notice and

comment.'" (citations omitted)).  In addition, Petitioner's claimed prejudice is indefinite and

speculative, and therefore not cognizable.  *Cf. United States v. Birney*, 686 F.2d 102, 105-06

(2d Cir. 1982) ("[P]roof of prejudice must be definite and not speculative." (citations omitted)).

Depending on the good-time credit Petitioner does or does not earn going forward, and the speed

with which his Petition moves through the federal court system, his claimed prejudice may not

come to fruition.  Plaintiff has therefore failed to demonstrate any violation of *Wolff*'s written-

statement requirement.

---

[13] On this point, Petitioner does not cite any BOP regulation, and, indeed, the BOP regulations do not specify any time frame for delivery of a hearing decision.  *See* 28 C.F.R. § 541.8(h).  Rather, it is only the BOP Program Statement that provides that a DHO report is "ordinarily" delivered to an inmate within 15 work days.  *See* BOP Program Statement 5270.09, at 34.

ii.     **The Purportedly Late Delivery of the Incident**
        **<u>Report Cannot Give Rise to a Due-Process Violation.</u>**

Petitioner contends that, regardless of *Wolff*, the Court should find that the purportedly

late delivery of the *Incident Report* violated his due-process rights because its late delivery

allegedly violated 28 C.F.R. § 541.5(a) and related sections of the BOP Program Statement.  As

noted, however, violations of BOP regulations "do not typically offend due process," and courts

that have suggested that such violations could offend due process have required the petitioner to

"demonstrate prejudice from the noncompliance."  *Agosto*, 2014 WL 2217908 at *3-4; *see also*

*Mendoza v. Tamez*, 451 F. App'x 715, 717-18 (10th Cir. 2011) (noting that a technical violation

of 28 C.F.R. § 541.5(a) does not amount to a due-process violation because an inmate has no

liberty interest "in the proper enforcement of prison regulations," and "[l]ate notice of a

disciplinary charge does not represent" an "'atypical or significant hardship . . . in relation to the

ordinary incidents of prison life'" (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995))).

In this instance, Petitioner has not even demonstrated a procedural violation of any regulation or

guideline, based on the delivery of the Incident Report to Petitioner within 31 hours rather than

24.  By its own language, Section 541.5(a) is not mandatory (similar to the Program Statement

language quoted above with respect to the time frame for delivery of a hearing decision (*see*

*supra*, at Discussion Section I(B)(1)(a))), as the regulation only states that inmates "will

*ordinarily* receive the incident report within 24 hours of staff becoming aware of [the inmate's]

involvement in the incident."  28 C.F.R. § 541.5(a) (emphasis added); *see also Mendoza*,

451 F. App'x at 717-18 (finding that a "plain reading" of 28 C.F.R. § 541.5(a) shows that it is

"advisory" and "flexible" in nature); *Jones*, 637 F.3d at 846-47 (noting that a BOP regulation

"stating when events 'ordinarily' should occur" appeared to be "advisory").  Similarly, the BOP

Program Statement relating to the delivery of an incident report only states that the report

"should" be delivered to the inmate within 24 hours, BOP Program Statement 5270.09, at 18-19, not that it must be delivered within that time.

Moreover, although Lt. Kostecki's explanation for the late delivery may not have fallen under one of the examples of "good cause" listed in BOP Program Statement 5270.09, by its own language, the BOP Program Statement's enumeration of examples of "good cause" is not exhaustive.  *See id.* (using the words, "such as," in listing examples of good cause for a late delivery).  Thus, even assuming that a violation of a BOP regulation or the BOP Program Statement could violate due process, Petitioner has not demonstrated that Respondent violated any mandatory provision of a BOP regulation or the BOP Program Statement.

Petitioner also contends that the initial version of the Incident Report should have contained an explanation for its late delivery, consistent with the BOP Program Statement, which provides, "[t]he reason for the delay *must* be documented in the discipline record."  (Pet. Habeas Reply, at 2-3 (referring to BOP Program Statement 5270.09, at 18-19 (emphasis added)).)  The Program Statement does not, however, specify *when* the explanation must be documented, and Petitioner concedes that Lt. Kostecki documented an explanation for the late delivery in between Petitioner's two DHO hearings.[14]

_____

[14] Additionally, although ultimately irrelevant to this Court's recommendations, Respondent has argued that the delivery of the Incident Report to Petitioner was not, in fact, made outside the 24-hour period referred to in 28 C.F.R. § 541.5(a) and related sections of the Program Statement because, under Section 5720.09 of the Program Statement, that period was tolled while the FBI was considering whether to institute a criminal prosecution against Petitioner.  (Resp. Habeas Opp., at 13 (citing 11/20/15 Scannell-Vessella Decl., at Ex. H; quoting BOP Program Statement 5720.09, at 18 ("[I]f an incident is referred for prosecution, the report is delivered by the end of the next business day after release for administrative processing.")).)  Petitioner challenges this tolling argument by suggesting that there actually was no FBI referral for potential prosecution (*see* Pet. Reply Addendum, at 2-3 (referring to the fact that the Administrative Detention Order did not include a check-mark to indicate that his detention was "[p]ending investigation . . . for a criminal act")), and also by arguing that any such explanation for late delivery would be inconsistent with Lt. Kostecki's explanation that he delivered the

In any event, even if Petitioner could point to a technical violation of BOP regulations or the BOP Program Statement with respect to the delivery of his Incident Report, he has failed to allege any cognizable form of prejudice. Liberally construed, the prejudice he alleges is that he failed to prepare a defense to the underlying narcotics smuggling charges against him because he "reasonably relied" on 28 C.F.R. § 541.5(a) and related sections of the BOP Program Statement, which he believed required delivery of the Incident Report to him within 24 hours. (*See* Pet. Reply Addendum, at 1.) Proof of prejudice, however, must be definite and specific. *See Birney*, 686 F.2d at 105-06. Without indicating what his defense would have been or what evidence may have been lost as a result of his supposed reliance on BOP regulations and guidance, Petitioner cannot sustain a due-process claim. *See, e.g.*, *United States v. Scala*, 388 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2005).

### iii.        Sufficient Evidence Supported the DHO's Determination.

Although not expressly raised by Petitioner as a due-process violation, his Petition, liberally construed, also seeks relief on the ground that insufficient evidence supported the findings by DHO Banks that resulted in Petitioner's loss of good-time credit. (*See* Pet., at 14-15.) Petitioner alleges that DHO Banks "mistakenly believed" that Petitioner's agreement with certain facts "amounted to an admission that the charges in the incident report were true," which Petitioner denies. (*Id.*)

---

Incident Report late simply because he misread the applicable form (*see id.*; *see also* Pet. Habeas Reply, at 7). This Court need not decide the tolling question here because, as discussed above, even if the matter was never referred to the FBI, neither 28 C.F.R. § 541.5(a) nor related BOP Program Statement sections actually required that the Incident Report be delivered within 24 hours.

It is well established, however, that due process in the prison disciplinary context only requires that a prison disciplinary board's decision be "supported by some evidence in the record." *Superintendent, Mass. Corr. Ins. v. Hill*, 472 U.S. 445, 454 (1985); *see also Williams v. Menifee*, 31 F. App'x 59, 60-61 (2d Cir. 2009).  "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  The Second Circuit has held that "the 'some evidence' standard outlined by the Supreme Court in *Hill* 'is extremely tolerant and is satisfied if there is *any* evidence in the record that supports the disciplinary ruling.'" *Rodriguez*, 498 F. App'x at 72 (quoting *Sira*, 380 F.3d at 69 (emphasis in original)); *but see Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004) (noting that the "some evidence" standard nonetheless requires "reliable evidence").

Here, even if DHO Banks did mistakenly construe Petitioner's comments as an admission to the substantive allegations in the Incident Report, where no admission was intended, DHO Banks expressly relied upon other evidence to arrive at his conclusion, as well.  (*See* DHO Report §§ III(D), V.)  Specifically, he relied upon the Incident Report and its supporting documentation, which included a memorandum dated February 1, 2015 submitted by the investigator who tested the strips that Petitioner voided while on dry-cell status, and related photographs.  (*See id.*; *see also* 11/20/15 Scannell-Vessella Decl., Exs. B-F.)  Having now reviewed this evidence, this Court finds that it is sufficiently reliable and probative to meet the "some evidence" standard outlined in *Hill*.

In sum, I find that each of Petitioner's arguments regarding alleged due-process violations lack merit.  I therefore recommend that his due-process claims be dismissed.

### 2.    **Petitioner's Equal-Protection Claim**

Petitioner contends that his right to equal protection under the law was violated because the BOP dismissed disciplinary charges against two supposedly similarly situated inmates, allegedly on the ground that their incident reports were delivered outside of the 24-hour window described in 28 C.F.R. § 541.5(a).  (Pet., at 22-24.)

One alleged comparator inmate is named John Harlow ("Harlow").  It is not clear whether Petitioner knows Harlow personally, given that Petitioner cites Harlow's case, *Harlow v. Sansberry*, No. 2:08cv558 (MSD) (JEB), 2009 U.S. Dist. LEXIS 72339 (E.D. Va. Aug. 14, 2009), as support for his assertion that he and Harlow were similarly situated.  (*See* Pet., at 22.)  Having reviewed the district court opinion cited by Petitioner, which adopted a magistrate judge's report and recommendation, and having reviewed the underlying report and recommendation (*Harlow v. Sansberry*, 2009 U.S. Dist. LEXIS 72376 (E.D. Va. July 8, 2009)), there is no indication in either document that Harlow's disciplinary proceedings were dismissed because his incident report was delivered to him late.  Indeed, the magistrate judge's report and recommendation simply stated that Harlow's incident report was delivered later than 24 hours after his alleged infraction occurred, and that the DHO in the matter later expunged Harlow's incident report.  *Id.* at *1-3.  The report and recommendation did not draw any connection between the two occurrences.  *Id.*  Nor did the District Judge's opinion adopting the report and recommendation.

Respondent, for his part, has submitted a declaration from Curtis L. Hise, the DHO who presided over Harlow's disciplinary proceedings.  (*See* Hise Decl.; *see also supra*, at n.3)  Although Hise states that he does not specifically recall Harlow's disciplinary hearing, he attached to his Declaration the DHO report that he prepared in connection with that hearing.

(*See* Hise Decl., Ex. A (Discipline Hearing Officer Report re Incident Report #1790766, dated Dec. 16, 2008) (Dkt. 26-1).)  According to the report, Harlow's incident report was expunged "based on a review of the evidence, the inmate's statement at the hearing[,] and the DHO's determination that the depiction of the incident in Section 11 of the incident report [was] void of specific behavior on the part of inmate Harlow to substantiate the charge against him."  (*Id.*) Nowhere does the report mention that Harlow's incident report was expunged because it was delivered to him late.  As Petitioner has failed to allege any other reason that he was similarly situated to Harlow, his attempt to use Harlow as a comparator for his equal-protection claim fails.  *See, e.g.*, *Martinez*, 2014 WL 8663307, at *2 ("In this District, courts have denied several *habeas* petitioners' 'class of one' claims, which typically challenge parole decisions, due to insufficient similarity between the petitioner and comparators." (citations omitted)).

Petitioner's second, and only other, alleged comparator inmate is his cellmate, Maurice Edgehill ("Edgehill").  (Pet., at 22.)  Although Respondent concedes that the disciplinary charges against Edgehill were dismissed because of a failure to deliver his incident report within 24 hours (*see* Resp. Habeas Opp., at 15; Gurrera Decl. ¶ 8), Respondent maintains that Petitioner and Edgehill are not similarly situated.  Respondent notes that Edgehill was charged with refusing an order to leave the SHU and return to the inmate general population in violation of BOP Code 306, and that, unlike Petitioner, Edgehill's conduct was not referred to the FBI for potential prosecution.  (*See* Resp. Habeas Opp., at 15; Gurrera Decl. ¶¶ 4-5.)  According to BOP regulations, the charge against Edgehill, a violation of BOP Code 306, *i.e.*, "[r]efusing to . . . accept a program assignment," is a "Moderate Severity Level Prohibited Act[ ]." *See* 28 C.F.R. § 541.3, Table 1.  Such a prohibited act is two levels below the charge against Petitioner, *i.e.*, a violation of BOP Code 113, which BOP regulations characterize as a "Greatest

Severity Level Prohibited Act[ ]."  *See id.*  Accordingly, regardless of whether Petitioner's alleged misconduct was, in fact, referred to the FBI, given the difference in the nature of the charges against Petitioner and Edgehill, and the difference in the manner that BOP regulations categorize those charges, Petitioner has not shown a sufficient degree of similarity between himself and Edgehill.  *See Martinez*, 2014 WL 8663307, at *2.

Moreover, Petitioner has not demonstrated that the BOP lacked a rational basis for treating him and Edgehill differently, as the BOP has a legitimate penological interest in not dismissing charges against an inmate who allegedly commits an infraction deemed to be of "greatest severity," on the ground that that inmate's incident report was delivered seven hours later than a BOP regulation states should "ordinarily" be the goal.

Accordingly, I recommend that Petitioner's equal-protection claim be dismissed.

### 3.     Petitioner's Claim for Denial of Court Access

Finally, Petitioner alleges that his First Amendment right to access to the courts was violated because the electronic law library where he was being held was non-operational during the three weeks that he had to prepare for his initial DHO hearing.  (*See* Pet., at 24-28.) Respondent does not dispute that the law library was non-operational during this time frame. (*See* Resp. Habeas Opp., at 15-16.)  Instead, Respondent argues that, as a matter of law, Petitioner does not have a right to law-library access to prepare for a prison disciplinary proceeding, and that, in any event, he failed to follow prison protocol with respect to his library grievance, as he failed to submit a request to the FCI Otisville Education Department that the electronic law library be repaired.  (*Id.*; *see also* Whinnery Decl. ¶¶ 4-7.)  Petitioner counters that the prison protocol directing him to submit a complaint to the Education Department was only

available through the very electronic law library that he alleges was non-operational.  (*See* Pet. Habeas Reply, at 8.)

As this Court has held, an inmate's First Amendment right to court access does not encompass a right to access legal materials to prepare for a prison disciplinary proceeding or appeal.  *See Salvatierra*, 2010 WL 5480756, at * 21; *see also Young*, 2015 WL 309431, at *13. Instead, that right only extends to the access needed to defend oneself, or to bring claims, in court, related to attacking one's sentence or challenging the conditions of one's confinement. *See Salvatierra*, 2010 WL 5480756, at * 21 (citations omitted).  Thus, in Petitioner's circumstances, his right-to-court-access claim is not cognizable.

Moreover, Petitioner has failed to allege any actual injury in connection with the out-of-commission law library.  He alleges that the lack of library access "hampered, hindered and prevented him from preparing a non-frivolous claim" (Pet., at 25), but, at the same time, he maintains that he chose not to prepare a substantive defense ahead of his DHO hearing, due to his belief that prison staff's supposed non-compliance with BOP regulations exonerated him completely (*see* Pet. Reply Addendum, at 1).  These allegations appear inconsistent.  For that matter, Petitioner has never suggested that he had any substantive defense to the disciplinary charge against him.  Further, to the extent Petitioner is arguing that he would have researched his due-process claims more thoroughly had he been given law-library access, this Court is not persuaded that his inability to conduct further legal research before his DHO hearing caused him any injury.  Despite the lack of library access, Petitioner still managed to attend his DHO hearing with a prepared, three-page written statement, in which he alleged substantially the same core due-process arguments that he is making before this Court, citing the same or similar regulations and BOP Program Statement sections.  (*See* Pet., Ex. C.)  Accordingly, even if Petitioner had a

constitutional right to access FCI Otisville's law library to prepare for his administrative hearing, he has failed to show any injury resulting from that lack of access. *See Crichlow*, 2015 WL 678725 (noting that a right of court access claim requires a showing that the petitioner's lack of access "resulted in an actual injury," in that it "frustrated [his] efforts to pursue a nonfrivolous claim").

For these reasons, I recommend that the Court dismiss Petitioner's claim for denial of his right of access to the courts.

## II.   PETITIONER'S SANCTIONS MOTION

### A.   Applicable Legal Standards

Although Petitioner cites Rule 37 in pursuing sanctions against Respondent for allegedly fabricating evidence, that Rule "is most relevant when a party fails to comply with a court order to produce discovery or fails to produce to an adversary relevant, requested information." *See Jung v. Neschis*, No. 01cv6993 (RMB) (THK), 2009 WL 762835, at *13 (S.D.N.Y. Mar. 23, 2009). Where, as here, Petitioner effectively contends that Respondent has "committed fraud on the court by fabricating evidence and making misrepresentations to the Court, it is the Court's inherent authority that provides the primary basis on which to act." *Id.* at *13; *see also Shangold v. Walt Disney Co.*, No. 03cv9522 (WHP), 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006) (relying upon the Court's inherent power to sanction a litigant for fabricating evidence); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439-44 (S.D.N.Y. 2002) (same). In light of Petitioner's *pro se* status, this Court thus liberally construes his sanctions motion as seeking relief based on the Court's inherent authority.

"Fraud on the court must be established by clear and convincing evidence." *Shangold*, 2006 WL 71672, at *4 (citations omitted); *see also Jung*, 2009 WL 762835, at *21. The burden

of proof lies with the moving party.  *See Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 406 (S.D.N.Y. 2010) (holding that a "colorable counter-narrative" and rebuttal evidence was sufficient to establish that the moving party had failed to carry its "ultimate burden of clear and convincing evidence"); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97cv4978 (LMM), 2002 WL 1271722, at *1-2 (S.D.N.Y. May 29, 2002) (denying a motion to dismiss a case on the ground that the opposing party falsified evidence because the moving party "failed to meet their clear and convincing burden").

Pursuant to the Court's inherent authority, and in order to "deter abuse of the judicial process and assure a level playing field for all litigants," *Shangold*, 2006 WL 71672, at *4 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)) (other citations omitted), the Court may impose sanctions against parties that perpetrate fraud on the court.  The Supreme Court has made clear, however, that a court's inherent power to sanction "must be exercised with restraint and discretion."  *Chambers*, 501 U.S. at 44; *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen  & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (requiring "a particularized showing of bad faith to justify the use of the court's inherent power").

In exercising its inherent power, the Court also has discretion "to fashion an appropriate sanction for conduct which abuses the judicial process."  *Chambers*, 501 U.S. at 44-45.  A default judgment, which Petitioner requests here, is one sanction available to the Court if it concludes that Respondent perpetrated a fraud on the Court.  *See Jung*, 2009 WL 762835, at *14. A default judgment, however, is a "drastic remedy," which "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 123 (S.D.N.Y. 2015) (internal quotation marks and

citations omitted).  In fashioning the appropriate sanction for fraud on the court, courts have

considered:  "'(1) whether the misconduct was the product of intentional bad faith; (2) whether

and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of

misbehavior, rather than an isolated instance; (4) whether and when the misconduct was

corrected; and (5) whether further misconduct is likely to continue in the future.'"  *Shangold*,

2006 WL 71672, at *4 (quoting *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*,

191 F. Supp. 2d 440, 446 (S.D.N.Y. 2002)).

## B.   The Sanctions Motion Should Be Denied.

Petitioner argues that Respondent should be sanctioned for allegedly fabricating a

document entitled, "Federal Bureau of Prisons Referral of an Inmate Criminal Matter for

Investigation," dated February 2, 2015, which was purportedly sent from the BOP to FBI Special

Agent Seamus Clarke ("Clarke") (the "FBI Referral").  (*See* 11/20/15 Scannell-Vessella Decl.,

Ex. H.)  Petitioner's evidence of fabrication is primarily based on the fact that, when he made a

Freedom of Information Act/Privacy Act ("FOIA" or "FOIPA") request for documents regarding

the supposed referral, he was told by the FBI that no such documents could be located; hence, he

assumes that the document presented now, by Respondent, must have been fraudulently created,

after the fact.  (*See* Pet. Sanctions Mot. ¶¶ 6-7, 14; Pet. Sanctions Mem., at 2-3.)

Specifically, Petitioner contends that he submitted a FOIA request to the FBI in order to

procure the FBI Referral, or related documents, so that he could verify that the BOP had, in fact,

referred his alleged misconduct to the FBI for potential criminal prosecution.  (*See* Pet. Sanctions

Mot. ¶¶ 6-7; 1/5/16 Bullock Decl. ¶¶ 6-7 & Exs. B-C.)  In pertinent part, Petitioner's FOIA

request stated:

> On or about February 2, 2015, a criminal matter was referred to
> your agency from the Federal Bureau of Prisons, in regard to the

> identifiers listed above [*i.e.*, Petitioner's name, SSN, FBI number,
> Marshals number, date of birth, and place of birth] for possible
> investigation/prosecution.  It has been stated that your agency
> declined the same on or about February 4, 2015.  I'm requesting all
> nonexempt documentation in your possession regarding the same
> subject matter.  I would add that the same was referred to Special
> Agent S. Clarke, FBI.

(*See* 1/5/16 Bullock Decl., Ex. B (Petitioner FOIA Request, dated Dec. 10, 2015).)  In response,

David M. Hardy, the Section Chief of the FBI's Record/Information Dissemination Section,

wrote:

> Based on the information you provided, we conducted a search of
> the Central Records System.  We were unable to identify main file
> records responsive to the FOIPA.  If you have additional
> information pertaining to the subject that you believe was of
> investigative interest to the Bureau, please provide us the details
> and we will conduct an additional search.

(*See* 1/15/16 Bullock Decl., Ex. C (Letter from David M. Hardy to Joseph Bullock, dated

Dec. 22, 2015 ("Hardy Letter")).)

    As a result of the FBI not providing him with any documents in response to his FOIA

request, Petitioner concludes that the BOP never truly referred his alleged misconduct to the FBI.

(Pet. Sanctions Mot. ¶¶ 6-7, 14; Pet. Sanctions Mem., at 2-3.)  As further support for this

assertion, Petitioner again points to the fact that, while there was a check-mark on his

Administrative Detention Order, indicating that his detention was "[p]ending a hearing for a

violation of Bureau regulations," there was no additional check-mark indicating detention

"[p]ending investigation . . . for a criminal act."  (*See* Pet. Sanctions Reply, at 2.)

    Petitioner maintains that the alleged fabrication of the FBI Referral goes to the "heart of

the case," because, according to Petitioner, Respondent has now contended that the reason that

prison staff failed to provide him with his Incident Report within 24 hours was due to the

supposed referral of the matter to the FBI for potential prosecution.  (Pet. Sanctions Mem., at

2-3.)  Petitioner also argues that the alleged fabrication is significant because Respondent has

alleged that Petitioner and his cellmate, Edgehill, were not similarly situated on the ground that

Petitioner's alleged misconduct was referred to the FBI, but Edgehill's was not.  (*Id.*)

Respondent counters by providing what is represented to be the transmission email for

the FBI Referral, dated February 2, 2015, and addressed to Clarke, from FCI Otisville SIS

Lieutenant David Susney ("Susney").  (*See* 2/18/16 Scannell-Vessella Decl., Ex. 1.)  According

to Respondent, this email "removes any doubt that the BOP prepared the [r]eferral" to the FBI of

Petitioner's alleged misconduct.  (Resp. Sanctions Opp., at 2.)  Respondent also provides another

copy of the FBI Referral, with "a clearer fax legend" at the top of each exhibit page.  (*See id.*

at 3; 2/18/16 Scannell-Vessella Decl., Ex. 2.)  Respondent's suggestion appears to be that this

supposed fax legend supports the assertion that the FBI Referral was indeed faxed.  Respondent

further notes that the BOP was unable to locate the first page of the fax, although, according to

Respondent's counsel, this was likely just a "coversheet," lacking any substantive information.

(*See* Resp. Sanctions Opp., at 3 n.3; *see also* 2/18/16 Scannell-Vessella Decl. ¶ 6.)  Respondent,

though, has not submitted any affidavit or declaration from Susney, the author of the transmittal

email, or from Clarke, the addressee.

Petitioner replies that the missing page of the fax is critical, because he believes that it

would prove whether or not the FBI Referral was indeed transmitted to the FBI.  (Pet. Sanctions

Reply, at 1.)  Petitioner also contends that supposed "fax legend" provided by Respondent is not

proof that the document was faxed, but, rather, "could be anything."  (*Id.* at 2.)  He concludes by

requesting an evidentiary hearing.  (*Id.* at 3.)

Having reviewed the parties' submissions, this Court finds that Petitioner has failed to

meet his burden of demonstrating, by "clear and convincing" evidence, that Respondent

fabricated the FBI Referral.  As an initial matter, there does not appear to be any actual discrepancy between Petitioner's Administrative Detention Order and Respondent's representations to the Court regarding the FBI Referral.  While Petitioner is correct that the Administrative Detention Order does not contain a check-mark to indicate that he was being detained "[p]ending investigation . . . for a criminal act" (Pet., Ex. A), Respondent has not represented that the FBI Referral is evidence that there was a "pending investigation" (*see* Resp. Habeas Opp., at 3, 13).  In fact, the FBI Referral, on its face, does not contain any language suggesting that a criminal investigation was ever undertaken.  (*See* 11/20/15 Scannell-Vessella Decl., Ex. H.)  Instead, the FBI Referral displays a title of "Referral of an Inmate Criminal Matter for Investigation" and a checked box indicating that the FBI has "[d]eclined" the referral of Petitioner's matter for investigation.  (*Id.* at 1-2.)  Thus, there is no evident inconsistency between the two documents.

Furthermore, the fact that Petitioner did not receive a copy of the FBI Referral or related documents in response to his FOIA request is not clear and convincing evidence that Respondent – or BOP staff or counsel – fabricated the FBI Referral.  Although, in response to a FOIA request, an agency must conduct a search that is "reasonably calculated to discover the documents requested," *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1202 (D.C. Cir. 1991), it is not required to "examine virtually every document in its files," *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994).  Additionally, the law anticipates that an initial FOIA request may not guarantee the production of all requested documents, even where those documents exist.  In this regard, the law provides that, where an agency's search appears to have been inadequate, the requesting party may commence a civil action against the agency, although the requesting party must first appeal the FOIA response through

administrative channels and generally must exhaust all such administrative remedies prior to

filing suit.  *See Wilbur v. Cent. Intelligence Agency*, 355 F.3d 675, 676-77 (D.C. Cir. 2004).  In

this instance, a plausible counter-narrative to "fabrication" is that the FBI missed the FBI

Referral and related documents in its search, but that it may have been able to uncover those

documents if Petitioner had appealed his FOIA response, as the FOIA response informed him

that he was permitted to do.  (*See* Hardy Letter ("You may file an appeal by writing to the

Director, Office of Information Policy (OIP) . . . .").)

Overall, while it might have been helpful for Respondent to submit an affidavit or

declaration from Susney or Clarke, Respondent has no obligation here to "disprove" fraud;

rather, the heavy burden of proof to demonstrate fraud on the Court falls on Petitioner, *see*

*Passlogix*, 708 F. Supp. 2d at 406, and, on the record presented, he has not come close to doing

so.  Nor does this Court find that an evidentiary hearing is required to resolve Petitioner's

sanctions motion.  "[I]t is within the Court's discretion to hold an evidentiary hearing on a

sanctions motion, although no such hearing is required."  *In re Dynex Capital, Inc. Sec. Litig.*,

No. 05cv1897 (HB) (DF), 2011 WL 2581755, at *3 (S.D.N.Y. Apr. 29, 2011), *report and*

*recommendation adopted*, 2011 WL 2471267 (S.D.N.Y. June 21, 2011) (citations omitted).

Here – where no genuine inconsistency in the evidence has been shown; where there are

plausible, legitimate reasons why the supposedly inconsistent documents highlighted by

Petitioner read as they do; where Petitioner primarily suggests that a document was fabricated

simply because it was not produced in response to an initial FOIA request, as to which there was

no requested follow-up or appeal; where Respondent has come forward with at least some

evidence to rebut the claim of fabrication; and where, for the reasons discussed above, the

document in question relates only peripherally, at best, to the merits of Petitioner's underlying habeas claims – no hearing is warranted.

As Petitioner has not met his burden of demonstrating fraud on the Court, and as he has not shown a sufficient basis for the Court to hold a hearing on the matter, I recommend that his sanctions motion be denied.

## **CONCLUSION**

For all of the foregoing reasons, I respectfully recommend that:

  (1)   Petitioner's Petition for a Writ of Habeas Corpus (Dkt. 2) be
        DISMISSED in its entirety; and

  (2)   Petitioner's motion for sanctions (Dkt. 34) be DENIED.

"[N]o certificate of appealability is necessary" for an appeal from the denial of a petition for habeas relief brought under 28 U.S.C. § 2241. *Jennings v. Schult*, 377 F. App'x 97 (2d Cir. 2010) (Summary Order).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, United States Courthouse, 500 Pearl Street, New York, New York 10007, Room 1320, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Petitioner does not have access to cases cited herein that are reported only on Westlaw or LexisNexis, he may request copies from Respondent's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

Dated:  New York, New York
        August 24, 2016

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Laura Taylor Swain, U.S.D.J.

Mr. Joseph Bullock
50433-019
Federal Correctional Institution
P.O. Box 1000
Otisville, NY 10963

Respondent's Counsel (via ECF)